## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 1:22-cr-343 (RC)** |
| **JOHN THOMAS GORDON** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence John Thomas Gordon to 18 months' incarceration, which is the high-end of the guideline range calculated by the Probation Office and agreed to by the parties, 3 years of supervised release, $2,000 restitution, and a mandatory $100 special assessment.

## I.      INTRODUCTION

The defendant, John Thomas Gordon, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Gordon, a former semi-professional baseball player with a long, violent criminal history, joined an angry mob on the North side of the Capitol building at approximately 3:40 p.m. While standing on the North steps near police officers protecting the North doors from illegal entry at 3:47 p.m., he glared at the officers and repeatedly chanted at them, "This is our house!," "Stop the Steal!," "You're cowards," and "F**ck you, fake-ass police" shortly before another rioter assaulted the officers with bear spray at 3:49 p.m. After the officers retreated inside the building in response to the bear spray attack, Gordon and other rioters made their way up the North steps to just outside the North doors. At approximately 4:05 p.m., Gordon joined a mob attempting to gain entry to the Capitol building by causing damage to the North doors. Gordon yelled "F**ck D.C." and began repeatedly throwing a round, softball size, hard object that may have been a rock, and that may have weighed approximately one to three pounds at the North doors even while officers were standing just behind the doors and spraying chemical irritants toward him to disperse the mob. He then charged the doors and kicked them with enough force to cause damage.

The government recommends that the Court sentence Gordon to 18 months' incarceration, which is within the advisory Guidelines' range of 12-18 months, for Gordon's civil disorder conviction under 18 U.S.C. § 231(a)(3). An 18-month sentence reflects the gravity of Gordon's conduct.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers to the court to the stipulated Statement of Offense filed in this case, ECF 26 ¶¶ 1-7, for a short summary of the January 6, 2021 attack on the United States Capitol by

hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.      Gordon's Role in the January 6, 2021 Attack on the Capitol

On January 5, 2021, Gordon traveled from his residence in West Virginia to Washington, D.C. to attend the "Stop the Steal" rally and election-related events scheduled for the following day. ECF 26 ¶ 8 (Statement of Offense). On January 6, he attended the former President's "Stop the Steal" rally on the Ellipse with some friends and then walked to the Capitol complex with a crowd of people after the rally. *Id*. ¶ 9.

When he arrived on the West side of the Capitol grounds at approximately 3 p.m., a large mob had assembled on the grounds surrounding the Capitol building. *Id*. ¶ 10. Gordon observed that the Capitol building was closed to the public and police officers were actively attempting to keep the crowd from entering the building. *Id*. At approximately 3:30 p.m., Gordon went up a set of stairs leading from the Lower West Terrace to the Upper West Terrace and proceeded to the North side of the building. *Id*. ¶ 11. At approximately 3:40 p.m., he joined a mob that was facing the North doors of the Capitol building and were up against a police line protecting the North doors to the building. *Id*.

At approximately 3:45 p.m., Gordon was leading chants directed at the police line. He glared at the officers and can be heard on the officer's body worn camera video repeatedly chanting, "This is our house!," "Stop the Steal!," "You're cowards," and "F**ck you, fake-ass police." Exhibit 1, below, is a screenshot from the bodycam of one of the officer's protecting the

North doors:[2]



*Exhibit 1*

At approximately 3:49 p.m., another rioter standing near Gordon fired bear spray at the police line, which caused the officers to retreat to inside the building. At approximately 3:53 p.m., Gordon and other rioters pushed their way up the North steps as the officers were reentering the Capitol building after the bear spray attack. The mob, including Gordon, attempted to enter the

---

[2] The government will submit clips of the relevant videos to the Court by USAfx prior to the sentencing hearing.

Capitol building through the North doors, but officers from inside the building managed to secure the inner set of doors before the mob could enter. Exhibit 2, below, is a screenshot from an open-source video (Sarah Corriher) of Gordon pushing towards the North doors with the mob:



*Exhibit 2*

The North doors of the Capitol building were comprised of a set of outer doors, which lead to a vestibule, and a set of inner doors, which lead into the U.S. Capitol building. ECF 26 ¶ 12. At approximately 4:00 p.m., the outer doors were being held open by protestors as police officers were standing immediately behind the inner doors and actively attempting to prevent protestors from entering the building. *Id*. The rioters, including Gordon, could easily see the police officers attempting to prevent entry through the inner doors. *Id*. The police officers behind the inner doors periodically opened the inner doors just wide enough to spray chemical irritants toward the crowd

of rioters attempting entry into the building. *Id*.

By approximately 4:08 p.m., Gordon saw that other rioters were attempting to enter the Capitol Building through the set of inner North doors by damaging the doors. *Id*. ¶ 13. Exhibit 3, below, is a screenshot from an open-source video (Rundown Live) of Gordon standing just outside of the outer doors:



*Exhibit 3*

Shortly after police officers sprayed chemical irritants to disperse the mob standing near the outer doors, Gordon made his way to the front of the mob while shouting, "F**ck D.C.!" while the song "Thunderstruck" by the band AC\DC was being played from a loudspeaker in the crowd. He then began throwing, in a long overhand motion, as if throwing a baseball, a round, softball size, hard object that may have been a rock, and that may have weighed approximately one to three

pounds at the set of inner doors that officers were standing immediately behind. Exhibits 4-7, below, are screenshots of Gordon throwing the projectile at the door:



*Exhibit 4*



*Exhibit 5*



*Exhibit 6*



*Exhibit 7*

A loud "thud" could be heard as the projectile impacted the inner doors. ECF 26 ¶ 13. The mob surrounding Gordon cheered as he repeatedly retrieved the object and threw it again at the inner doors. *Id*. He threw the heavy projectile at the inner doors at least four times. He simultaneously yelled obscenities at police officers standing behind the inner doors while raising his middle fingers on both hands at them. *Id*. Exhibit 8, below, is a screenshot from an open-source video (News2Share) of Gordon raising his middle fingers to officers standing behind the inner doors:



*Exhibit 8*

The officers behind the inner doors continued to spray chemical irritants to disperse the mob standing near the outer doors and in the vestibule. ECF 26 ¶ 13. At approximately 4:10 p.m., Gordon began charging the inner doors and kicking them with enough force to damage and cause the inner doors to briefly open. *Id*. ¶ 14. Exhibit 9, below, is a screenshot from an open-source video (Rundown Live) of Gordon kicking the inner doors:



*Exhibit 9*

Another rioter handed Gordon a pair of ski goggles so he could better withstand the chemical irritants being sprayed by the officers. ECF 26 ¶ 14. He put them on for a very brief time and then gave them back and walked away from the North doors. *Id*. The North side of the Capitol was cleared by police at around 4:30 p.m.

### C.    Gordon's Limited Statements to the FBI

On March 26, 2022, Gordon was interviewed by a local police officer assisting the FBI at his residence in Davis, West Virginia. During the interview, Gordon appeared nervous, but he admitted that he was at the Capitol on January 6, 2021. Because the investigation was still in its early stages, the interviewing officer did not ask detailed questions about Gordon's activities on January 6, 2021. The purpose of the interview was to visually confirm that Gordon was the

individual depicted in the FBI's "Be on the Lookout" (BOLO) #218 after an online tip was made

that an individual matching the description of BOLO #218 was living at Gordon's residence.

Gordon has not since been interviewed, and the government is unaware of any statements

made by Gordon on social media regarding the Capitol riot.

## III.    THE CHARGES AND PLEA AGREEMENT

On October 18, 2022, a single-count criminal Information was filed charging Gordon with

civil disorder in violation of 18 U.S.C. § 231(a)(3). On, October 28, 2022, Gordon was convicted

of that offense based on a guilty plea entered pursuant to a plea agreement.

## IV.    STATUTORY PENALTIES

Gordon now faces sentencing on a single count of violating 18 U.S.C. § 231(a)(3). As noted

by the plea agreement and the Presentence Report issued by the U.S. Probation Office, Gordon

faces up to five years' imprisonment, a term of supervised release of not more than three years, a

fine up to $250,000, and a mandatory special assessment of $100.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings

by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49

(2007). The parties and Probation Office calculated the combined offense level of the count of

conviction as 11, as set forth below.

Count One: 18 U.S.C. § 231(a)(3)

| | |
|---|---|
| U.S.S.G. § 2A2.4(a) Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1)(A) Specific Offense Characteristics | +3 |
| (Offense involved dangerous weapon) | |
| **Total** | **13** |

|  |  |
|---|---|
| Acceptance of responsibility (U.S.S.G. §3E1.1) | <u>-2</u> |
| **Total Adjusted Offense Level:** | **11** |

*See* Plea Agreement at ¶¶ 5(A).

The U.S. Probation Office calculated Gordon's criminal history as category III, which the government does not dispute. PSR ¶ 48. Accordingly, based on the government's calculation of Gordon's total adjusted offense level of 11 after acceptance of responsibility, Gordon's Guidelines imprisonment range is 12 to 18 months. Gordon's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Gordon's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. The nature and circumstances of Gordon's offense[s] were of the utmost seriousness, and fully support the government's recommended sentence of 18 months' incarceration.

### B.    Gordon's History and Characteristics

Gordon is a former semi-professional baseball player and currently unemployed house manager for a men's long-term recovery home. PSR ¶¶ 89-97.

Gordon's crimes on January 6 were not an isolated event in an otherwise law-abiding life. They came, instead, after a long series of offense, some involving violence. That stands in sharp contrast to what he described to the Probation officer as his "loving" and supportive childhood. *See* PSR ¶ 61. That history includes:

- In 1998, Gordon was convicted of second-degree assault and sentenced to 60 days imprisonment. PSR ¶ 41.

- In 2003, Gordon pleaded no contest to possession with intent to deliver a controlled substance (cocaine) and was sentenced to 24 months' probation. Gordon violated the terms of his probation in 2006. PSR ¶ 42.

- In 2005, Gordon was arrested and found not guilty of malicious assault / malicious wounding. PSR ¶ 50.

- In 2009, Gordon was charged with possession of marijuana and sentenced to six months' imprisonment. PSR ¶ 43.

- In 2011, Gordon was charged with and convicted of wanton endangerment (felony), domestic assault (misdemeanor), and felon in possession of a firearm (felony). Gordon's wife called 911 after Gordon pointed a gun at her and his three children while he was intoxicated. Armed police officers surrounded Gordon's home before he surrendered. Gordon was sentenced to a total of 6.5 years imprisonment. An emergency protective order was entered. PSR ¶ 44.

- In 2012, Gordon plead no contest to violating the protective order related to his 2011 arrest when he wrote several hundred letters from the regional jail to the victims of the 2011 offense. PSR ¶ 45.

- In 2016, Gordon was convicted of domestic battery when he, while intoxicated, grabbed the neck of the mother of his child and threw her to the ground, then removed his infant child from a vehicle against the wishes of the mother. He then took the infant and fled the area before police arrived. Gordon spent 48 hours in jail and another emergency protective order was entered against him. PSR ¶ 46.

- In 2017, Gordon was charged with driving a vehicle while under the influence of alcohol, driving an uninsured vehicle, driving while impaired by alcohol, and negligent driving. In 2018, he was convicted of the DUI offense and sentenced to six months imprisonment and two years' supervised probation. He violated the

14

terms of his probation by continuously using marijuana throughout his supervision. He told his probation officer that he would not stop using marijuana, planned to bow hunt despite being prohibited from having dangerous weapons, no longer wanted to abide by the terms of his probation, and wanted to return to Maryland and serve the remainder of his term of imprisonment. PSR ¶ 47.

- In 2018, Gordon was charged with being a fugitive from justice in West Virginia relating to his probation violations in Maryland. There was no resulting conviction. PSR ¶ 51.

- The PSR notes additional automated records of a 2002 battery and protective orders, including a 2021-2022 protective order against Gordon by the mother of his youngest child and current partner. PSR ¶ 52-55.

Gordon is a former member of Dead Man Incorporated (DMI), which, according to Wikipedia, is a "predominantly white organized crime enterprise . . . founded in prison and has members in many correctional facilities and streets throughout Maryland, as well as other states in the U.S."[3] PSR ¶ 70. He stated he joined the DMI prison gang because it was a brotherhood of men looking out for one another while incarcerated. *Id.*

 Gordon's criminal history, including several convictions that did not generate any criminal history points, weighs in favor of a custodial sentence at the top of the advisory Guidelines range.

**C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Gordon joined a mob and caused significant damage to the United States Capitol building, the single most prominent symbol of this Nation's democracy. He cursed and taunted

---

[3] https://en.wikipedia.org/wiki/Dead_Man_Incorporated

police officers while they were attempting to carry out their duties. His belligerent criminal conduct on January 6, 2021 was the epitome of disrespect for the law.

### D.    The Need for the Sentence to Afford Adequate Deterrence

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[4] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Gordon's criminal history category of III understates his criminal history, which includes a shocking history of arrest and conviction demonstrating a clear pattern of violent assaultive behavior. *See* Section VI(B) *supra.* Despite his lengthy criminal history, Gordon came to Washington, D.C. on January 6, 2021 and shouted "F**ck D.C." while intentionally damaging the Capitol building. To date, Gordon has shown no remorse for his actions.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement

---

[4]  *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.     Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."    So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being

asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[5]

---

[5] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[6]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Matthew Capsel*, 22-cr-107 (TSC), the defendant, like Gordon, pleaded guilty to a single count charging a violation of Section 231(a)(3). He joined thousands of other rioters on the Lower West Terrace of the Capitol. At approximately 4:22 p.m., Capsel was part of a group of rioters who pushed against a police line on the Northwest side of the Capitol. Capsel encouraged other rioters to join the group push by waiving his hand and shouting. That evening, at about 6:14 p.m., the D.C National Guard established a perimeter on the west side of the Capitol. Capsel and a mob of his fellow rioters confronted the line of guardsmen on the western perimeter of the Capitol near the Peace Monument. Capsel was at the front of the mob and charged at the

---

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

line of National Guard troops, pushing against them for seven seconds before troops deployed OC spray against him, which caused him to retreat.

Capsel posted a statement to Facebook that "I tried to hold the line back till they sprayed me [freezing face emoji]." Capsel stated in another post, "On the 6 good men had to do a bad thing." In another post, Capsel made a slideshow with music containing photos of President Biden, then Speaker of the House Pelosi, and Senate Majority Leader Schumer. The music lyrics stated, "Wish you would die, just fucking die." Based on a Sentencing Guidelines range of 27 to 33 months, Judge Chutkan varied downward and sentenced Capsel to 18 months' incarceration and 24 months' supervised release.

In *United States v. Roger Baugh*, 22-cr-313 (JEB), the defendant, like Gordon, pleaded guilty to a single count charging a violation of Section 231(a)(3). Baugh and his codefendant Mark Mazza jointed a group of rioters who were trying to break through the police line to gain entry to the lower level of the U.S. Capitol Building at the Lower West Terrace Tunnel.   Baugh entered the LWT tunnel behind Mazza. As part of a large mob of rioters, Baugh engaged in several "heave-ho" pushes against the police line, seeking to dislodge the officers from their positions defending the Capitol. The efforts failed, and Baugh, like Gordon, never entered the Capitol Building. Like Gordon, Baugh's offense level was 11, but unlike Gordon, his criminal history category was only I and consequently, his Guidelines range was only 8 to 14 months. Judge Boasberg sentenced Baugh to a year and a day incarceration, above the middle of the Guidelines range, and 24 months' supervised release.

*United States v. Nolan Cooke*, 22-cr-52 (RCL) is another case in which the defendant pleaded guilty to a single count of violating Section 231(a)(3). Like Gordon, Cooke did not enter the Capitol Building. Cooke was on the front line of a group of rioters who broke through the police barricade on the East Front of the Capitol. Like Gordon, Cooke screamed and cursed at officers. He encouraged other rioters to push against the police line and "get" the officers. Similarly to Gordon throwing the projectile towards the police who were sheltering behind a door, Cooke grabbed a bike rack and pushed it against the police line. He struck a previously broken window with a pole while another rioter was breaking a window nearby. Cooke celebrated the riot by posting videos he took with a Go-Pro camera on social media. Like Gordon, his offense level was 11, but his criminal history was only I and his Guidelines range was therefore only 8 to 14 months. Judge Chutkan sentenced Cooke to a year and a day incarceration and 36 months' supervised release.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[7] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify

---

[7] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Gordon must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Gordon played in the riot on January 6.[8] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021. *Id.* Gordon's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 115.

---

[8] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 18 months' incarceration, which is the high-end of the guideline range calculated by the Probation Office, 3 years of supervised release, $2,000 restitution, and a mandatory $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By: */s/ Andrew J. Tessman*
ANDREW J. TESSMAN
Assistant United States Attorney
District of Columbia – Detailee
West Virginia Bar No. 13734
300 Virginia Street
Charleston, WV 25301
(304) 345-2200
Andrew.Tessman@usdoj.gov

## CERTIFICATE OF SERVICE

On this 1st day of March, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

By:  */s/ Andrew J. Tessman*
 ANDREW J. TESSMAN
Assistant United States Attorney
District of Columbia – Detailee
West Virginia Bar No. 13734
300 Virginia Street
Charleston, WV 25301
(304) 345-2200
Andrew.Tessman@usdoj.gov