**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **v.** | : | **Case No: 1:22-cr-00343 (RC)** |
| | : | |
| **JOHN THOMAS GORDON** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

**SENTENCING MEMORANDUM**
**ON BEHALF OF JOHN THOMAS GORDON**

Defendant John Thomas Gordon, through counsel, Nicholas J. Compton, Assistant Federal Public Defender, files this Sentencing Memorandum, which endeavors to highlight the mitigating factors in his case to assist this Honorable Court in its "overarching duty under § 3553(a) to impose a sentence sufficient, but not greater than necessary to comply with the sentencing purposes set forth in § 3553(a)(2)." *Pepper v. United States*, 562 U.S. 476 (2011) (internal quotations omitted). Pursuant to the advisory United States Sentencing Guidelines ("Guidelines") calculated in the Presentence Report ("PSR"), Mr. Gordon faces a recommended range of twelve (12) to eighteen (18) months imprisonment. PSR ¶ 109. Based on the applicable factors found in 18 U.S.C. § 3553(a), he respectfully requests that the Court impose a sentence below the low-end of those Guidelines. Specifically, Mr. Gordon requests that the Court impose a sentence of five (5) years probation.

**I. INTRODUCTION**

John Thomas Gordon is charged by Criminal Complaint with one count of Civil Disorder in violation of 18 U.S.C. § 231(a)(3). The charge stems from Mr. Gordon's conduct at the United States Capitol following former President Donald Trump's Stop the Steal rally in Washington, D.C. on January 6, 2021. Mr. Gordon was arrested on July 8, 2022, and made his initial appearance

1

that same day in the Northern District of West Virginia.  On July 14, 2022, he made his initial appearance via video teleconference in the United States District Court for the District of Columbia.  Following each appearance, Mr. Gordon was released on a personal recognizance bond.

On October 28, 2022, Mr. Gordon entered a guilty plea to the Information, pursuant to a written plea agreement.  As directed, the United States Probation Office prepared a Presentence Report.  In that Report, the Probation Office determined the guideline imprisonment range to be 12 – 18 months based on a total offense level of 11 and a criminal history category III.  *Id.*  The District Court has set Mr. Gordon's sentencing hearing for March 13, 2023.  Mr. Gordon has remained on personal recognizance bond throughout the duration of this case with no reported violations.  PSR ¶ 10.

## II. DISCUSSION

Mr. Gordon was born on June 16, 1975, in Baltimore, Maryland.  PSR ¶ 59.  As a child, his basic needs were met.  *Id.*  He described having a good home life and a great relationship with his parents growing up.  *Id.*   However, he acknowledges that during his formative years, his parents used alcohol and cocaine on the weekends, though never in front of the children.  PSR ¶ 62. Most disturbingly, Mr. Gordon reports that between the ages of 7 and 9 he was sexually abused by the teenage foster son of a family friend.  *Id.*  Even though the boy was caught in the act of molesting Mr. Gordon, nothing came of it.  The boy was removed from the home and placed back into foster care system.  *Id.*   The abuse was not reported to the police, and it was not spoken of again within the family.  The abuse, followed by the lack of acknowledgement, led to feelings of anger and worthlessness in Mr. Gordon.  He began to act out in school, often blaming others for

whatever problems he encountered.  Eventually, Mr. Gordon found baseball.  He enjoyed the sport and he found that it calmed his anger and kept his bad behavior in check.

Mr. Gordon played baseball throughout high school.  He graduated from Southern Garrett High School in Oakland, Maryland.  PSR ¶ 87.  After high school, he joined a semi-professional baseball team named the Oakland Oaks in Garrett County.  He played for the team for six years.  Because he wasn't compensated for playing baseball, Mr. Gordon also held other paying jobs.  In September 1997, Mr. Gordon married Veronica Cross.  PSR ¶ 63.  All in all, life was going pretty well for him.  He was married, he was working, and he was playing the sport that made him happy and gave him a purpose in life.

In October 1997, Mr. Gordon was working for Cleveland Construction as a laborer.  During work he fell off a ladder, herniating several discs and seriously injuring his back.  PSR ¶ 72.  The injury was so severe that it prevented Mr. Gordon from continuing to work and it permanently ended his ability to play baseball.  Suddenly, Mr. Gordon found himself disabled, unable to work, and unable to play the sport that for years had made him happy and kept those childhood anger issues at bay.  As indicated in the Presentence Report, life began to spiral out of control for Mr. Gordon.  His substance abuse began in earnest, with Mr. Gordon abusing marijuana, alcohol, prescription pain medication, valium, ecstasy, LSD, crack and powder cocaine, and heroin.  PSR ¶¶ 82-84.  On three different occasions, Mr. Gordon tried to kill himself—once by driving his car into a tree, and twice by overdosing on medication.  PSR ¶¶ 76-78.  Sadly, Mr. Gordon's injury also saw the beginning of his criminal history.  Prior to 1998, Mr. Gordon had no criminal history to speak of.  In April 1998, Mr. Gordon was convicted of Second Degree Assault.  Six years later he found himself convicted of conspiracy to possess with intent to deliver cocaine.  Six years after that, he was convicted of possession of marijuana.  By October 2011, Mr. Gordon's substance

abuse and bad behavior had taken its toll on his marriage and his family which now consisted of four children.   Mr. Gordon found himself convicted of his most serious offenses—wanton endangerment, domestic assault, and felon in possession of a firearm—all related to his behavior towards Veronica and the children.  PSR ¶ 44.  He was sentenced to a total of three years in jail.

Mr. Gordon's time in jail was difficult.  He had never before spent any significant time in jail.  While incarcerated, he joined Dead Man Incorporated (DMI), a gang predominantly found in prisons.  Mr. Gordon thought it was just a brotherhood of men who looked out for each other in prison. PSR ¶ 70.  The group turned out not to be what he was expecting.  Nevertheless, he found himself in solitary confinement for eight months because of his association with the organization.  The solitary confinement ultimately resulted in feelings of post-traumatic stress within Mr. Gordon.

Following his release from custody, Mr. Gordon met his current partner, Ashley Anderson, and the two had one son.  PSR ¶ 65.  Release into society was hard for Mr. Gordon.  He had stopped using the hard drugs, but he was still abusing alcohol and smoking marijuana.  In 2016, he spent two days in jail as a result of a misdemeanor domestic violence conviction involving Ms. Anderson.  PSR ¶ 46.  He was also convicted of a DUI in 2018.  PSR ¶ 47.  The DUI charge resulted from a car accident that left Mr. Gordon with head trauma and knee pain.

In 2020, Mr. Gordon was diagnosed with COVID-19.  The COVID infection caused an inflamed heart valve which ultimately led to Mr. Gordon suffering a heart attack.  PSR ¶¶ 73, 74.  The infection and heart attack were so bad, Mr. Gordon was transferred to a trauma center in Morgantown for treatment.  While recovering, Mr. Gordon had a revelation.  If he were to die suddenly, he didn't want to be remembered as a drunk and a drug addict.  Her certainly didn't want his son to remember him as such.  He set his mind to the long road of turning his life around.

In the meantime, while recovering, Mr. Gordon had been following the news and was aware of the Stop the Steal Rally planned by former President Trump for January 6, 2021.  Mr. Gordon's friend invited him to travel to Washington that day.  Mr. Gordon took him up on the offer.  He attended the rally on January 6th and then followed the crowd to the Capitol Building after the rally had concluded.  Mr. Gordon walked around the Capitol Building grounds with no intention of entering the building.  At some point, the crowd in Mr. Gordon's vicinity was informed of the shooting of Ashli Babbitt, a fellow protestor.  As the information spread in the crowd, Mr. Gordon was informed that Ms. Babbitt was a veteran who had been killed by Secret Service agents.  This information angered Mr. Gordon, causing him to, in his own words, "act the fool."  He then engaged in the behavior described in the Statement of the Offense.  ECF No. 26.

In the weeks and months following January 6th, Mr. Gordon was still feeling the urge to turn his life around.  That urge increased after Mr. Gordon saw all the videos of the attack on the news and felt shame that he took part in any of it.  Mr. Gordon stopped drinking on August 4, 2021, and stopped smoking marijuana in January 2022.  That same month, Mr. Gordon began participating in Chain Breakers, a faith-based drug treatment program.  PSR ¶ 85.  Shortly after starting Chain Breakers, he took a job with Hampshire County Pathways, Inc., working as a house manager in their long-term recovery home called Phoenix House.  PSR ¶ 91.  Mr. Gordon also began attending church regularly and was ultimately baptized.  He currently volunteers with his church's security and usher teams.  As of the filing of this memorandum, Mr. Gordon has received his certification as a Recovery Coach Professional and is pursuing his certification and a Peer Recovery Support Specialist (PRSS).  PSR ¶ 88.  He is working as part of the leadership team with Chain Breakers.  PSR ¶ 85.  Mr. Gordon has completely changed his life.  He is drug free as evidence by his negative drug tests while on bond.  Other than the instant offense, Mr. Gordon has

committed no additional crimes since 2017. He has specifically committed no offenses since January 6, 2021, and has committed no crimes while on bond in this case. Mr. Gordon has proven over the last 8 months that he can be successful under a period of federal supervision.

## III.    18 U.S.C § 3553(a) SENTENCING FACTORS.

In determining the appropriate sentence to impose, the District Court is directed to consider the nature and circumstances of the offense and the personal history and characteristics of the defendant. The sentence imposed should be sufficient but not greater than necessary to meet purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2). Considering all these factors, Mr. Gordon contends that a sentence of five (5) years probation is sufficient but not greater than necessary.

### A.    NATURE AND CIRCUMSTANCES OF THE OFFENSE.

As noted, the Statement of the Offense [ECF No. 26] well details the facts and circumstances of this case. Mr. Gordon accepts responsibility for his actions as described. Further, he offers his heartfelt apologies to all law enforcement at the Capitol on January 6th, members of Congress attempting to do their jobs that day, and the citizens of the District of Columbia whose daily lives were disrupted by the actions of Mr. Gordon and others that day. Mr. Gordon is truly sorry for his conduct.

Mr. Gordon's behavior on January 6, 2021, was foolish and it was criminal. He will suffer a felony conviction for it. That said, particularly in comparison to others at the Capitol that day, Mr. Gordon's behavior does not warrant a period of incarceration. The Court should note that Mr. Gordon did not enter the Capitol building on January 6th. He did not directly assault or batter any law enforcement officer. He did not wrench any weapon from an officer, beat an officer with a flagpole, or spray an officer with bear spray or any other irritant. Mr. Gordon did not come to

Washington, D.C. on January 6, 2021, with the intent to engage in any violent activity.  He did not bring with him any pepper spray or other irritant, any weapon[1], any defensive gear, or means of engaging in attack.  Mr. Gordon has no affiliation with the Oath Keepers, the Proud Boys, or any other extremist organization that conspired to disrupt Congress's certification of the 2020 Electoral College vote count and threaten the peaceful transfer of power after the 2020 Presidential election.  Lastly, Mr. Gordon did not brag about or advertise his misconduct on social media following the riot.  In fact, Mr. Gordon found himself embarrassed by the videos of the riot he saw on television and the videos of the his behavior he saw in discovery.

Mr. Gordon's behavior was serious, but contrary to the Government's position, his behavior on January 6th supports a variant sentence of probation.  Nothing in the facts and circumstances of this case suggests that a high-end guideline sentence is appropriate.  Quite the opposite.  A five-year probationary sentence—a sentence longer in duration than called for by the Government, the Guidelines, or Probation—will appropriately and sufficiently punish him for the misconduct described in the Statement of Offense.

### B.    PERSONAL HISTORY AND CHARACTERISTICS.

Mr. Gordon's history is marked by misfortune and tragedy.  His happy childhood was forever ruined by the sexual assault perpetrated against him.  The sexual assault led to mental health issues, drug use and bad behavior.  Those awful things were kept at bay for a period of time by Mr. Gordon's love of baseball.  When he injured his back and could no longer play baseball, Mr. Gordon's life imploded.  His drug use intensified, and he tried three times to kill himself.  He also began to find himself in trouble with the law.  Between 1998 and 2020, Mr. Gordon

---

[1] Mr. Gordon did not bring with him to Washington the hard object he was flinging at the doors to the Capitol.  The object did not belong to him and only came into his possession for the brief period of time Mr. Gordon was throwing it at the doors.  He did not take it with him.  The object was apparently never recovered by law enforcement.

accumulated five criminal history points for seven criminal convictions.  Four of those convictions were for assaultive-type domestic offenses.  A cursory review of Mr. Gordon's criminal history would suggest that he is a violent man.  However, if the Court examines those convictions, the Court will see that those convictions were all a result of Mr. Gordon's drug and alcohol abuse.  Mr. Gordon isn't a violent man.  He is an addict—or once was an addict.  Once he got clean, not only did the instances of domestic violence end, all criminal conduct ended.

Mr. Gordon's history is one of redemption.  He overcame and continues to overcome the abuse he suffered as child and the drug and alcohol addiction that stemmed from that abuse and his subsequent physical injuries.  Instead of using drugs, he is now counseling others to turn away from drug use.  Instead of joining a riot at the Capitol, he has joined a church and taken a job as a Recovery Coach and Peer Counselor.  This history is worthy of a probationary sentence.

### C.    NEED FOR THE SENTENCE TO REFLECT SERIOUSNESS OF OFFENSE, PROMOTE RESPECT FOR THE LAW, AND PROVIDE JUST PUNISHMENT.

A sentence below the Guidelines is sufficient for purposes of just punishment, to reflect the seriousness of the offense, and promote respect for the law.  *See* 18 U.S.C. § 3553(a)(2)(A). Unlike many others who engaged in far worse behavior, Mr. Gordon is not charged and convicted of a misdemeanor offense.  Mr. Gordon accepted responsibility for his behavior knowing he would incur the consequences of a felony conviction and the stigma of having been convicted of involvement in the Capitol riot.  He did so quickly and without unnecessarily contesting the facts of the case.  Contrary to the Government's assertion [ECF 34 at page 16], Mr. Gordon's quick acceptance of responsibility shows great respect for the law.  His lack of misconduct since January 6, 2021, and since he has gotten clean, also displays his great respect for the law.  The five-year probationary sentence Mr. Gordon requests here serves as just punishment for his actual

misconduct, and given its duration and the associated deprivation of liberty, promotes respect for the law among members of the public who may be considering engaging in similar behavior.

**D. NEED FOR THE SENTENCE TO PROVIDE ADEQUATE DETERRANCE AND PROTECT THE PUBLIC FROM FURTHER CRIMES OF THE DEFENDANT.**

Sentencing Mr. Gordon below the Guidelines also appears sufficient to achieve the goals of general and specific deterrence to future criminal conduct. *See* 18 U.S.C. § 3553(a)(2)(B)-(C). As a general matter, "[e]mpirical studies have shown that longer sentences have minimal or no benefit on whether offenders or potential offenders commit crimes." Brennan Center for Justice, *What Caused the Crime Decline?* 26 (Feb. 2015), *available at* https://www.brennancenter.org/publication/what-caused-crime-decline (last visited March 5, 2023). As to specific deterrence, "there is little evidence of a specific deterrent effect arising from the experience of imprisonment compared with the experience of noncustodial sanctions such as probation. Instead, the evidence suggests that reoffending is either unaffected or increased." Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 CRIME & JUST. 199, 201 (Aug. 2013), *available at* https://www.jstor.org/stable/10.1086/670398 (last visited March 5, 2023).

Mr. Gordon's post-offense efforts and success on pretrial release suggest a sincere desire to reform his behavior without the need for imprisonment. *See United States v. Robertson*, 662 F.3d 871 (7th Cir. 2011) ("[d]emonstrated self-motivated rehabilitation is direct and relevant evidence of 'the need for the sentence imposed' . . . to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant"); *United States v. Munoz-Nava*, 524 F.3d 1137 (10th Cir. 2008) (exemplary behavior on pretrial release shows unlikelihood of reoffending). In the time since January 6, 2021, and during the time he has been on bond, Mr. Gordon has gotten clean through the Chain Breakers recovery program. He has taken a leadership

role in the program and has worked to earn certificates as a Recovery Coach and a Peer Counselor. He has worked for Hampshire County Pathways as a house manager, recovery coach and peer counselor in their recovery home. He has also maintained an eBay business selling baseball cards. He has immersed himself in his church and its functions. Mr. Gordon has served as the primary caregiver for both his parents. His father is 71, blind, and bed-ridden with heart and lung ailments. His mother is 70 and also suffers from a multitude of health issues. Mr. Gordon has provided, and continues to provide, daily care for his parents including maintaining the house they live in. Most importantly, Mr. Gordon has devoted himself to his son and done his best to be a good father for him. By all accounts, Mr. Gordon has been a wonderful father, an attentive son, and a law-abiding, contributing member of society since his involvement in the January 6th riot. See Exhibits 1 – 16.

For purposes of general and specific deterrence, Mr. Gordon further points to findings from the National Institute of Justice, which is a program of the United States Department of Justice ("DOJ"), to support imposing a sentence below the Guidelines:

> Sending an individual convicted of a crime to prison isn't a very effective way to deter crime. Prisons are good for punishing criminals and keeping them off the street, but prison sentences (particularly long sentences) are unlikely to deter future crimes. Prisons actually may have the opposite effect. Inmates learn more effective crime strategies from each other, and time spent in prison may desensitize many to the threat of future imprisonment.

National Institute of Justice, *Five Things About Deterrence* (May 2016), *available at* http://www.nij.gov/five-things/pages/deterrence.aspx (last visited March 5, 2023). In other words, a sentence of imprisonment may risk more harm than good. The longer the sentence, the longer Mr. Gordon's exposure to more serious offenders who may do more to increase his risk of recidivism and danger to the public than to mitigate against it.

      **E.**      **NEED FOR THE SENTENCE TO PROVIDE EDUCATIONAL OR VOCATIONAL TRAINING, MEDICAL CARE, OR OTHER CORRECTIONAL TREATMENT.**

A sentence below the low end of the Guidelines also makes for the most effective means to meet the goals of 18 U.S.C. § 3553(a)(2)(D), which include providing "needed educational or vocational training, medical care, or correctional treatment in the most effective manner." The law recognizes that "imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a). Instead, these services are most effectively provided in the community. Mr. Gordon's physical and mental health history, his substance abuse history and subsequent treatment are before the Court in the Presentence Report.  His involvement with Chain Breakers, Pathways, and his church have kept Mr. Gordon clean and law-abiding.  Disrupting the current state of affairs with a jail sentence will only be detrimental to Mr. Gordon's mental health and sobriety.

F.      THE KINDS OF SENTENCES AVAILABLE.

In determining an appropriate sentence, § 3553(a)(3) directs the Court to consider all "the kinds of sentences available."  The Guidelines set a range of imprisonment between 12 and 18 months.  Since the guideline range falls within Zone C of the Sentencing Table, the Guidelines also authorize a split sentence involving six months incarceration and six months of home detention as part of sentence of supervised release.  PSR ¶ 110.  By statute (18 U.S.C. § 3561(c)(1)), Mr. Gordon is eligible for not less than one nor more than five years of probation. PSR ¶ 123.  Other than a sentence at the maximum possible punishment, a five (5) year term of probation represents the longest criminal justice sentence by duration available to the Court. Given the conditions available, a sentence of probation makes for a "substantial restriction of freedom." *See Gall v. United States*, 552 U.S. 38, 48 (2007). Conditions like community confinement or home detention may be imposed. The condition of "intermittent confinement" may also be imposed. *See* 18 U.S.C. § 3563(b)(10); *see also* USSG § 5F1.8. A condition of community service

11

should be considered. Numerous other conditions will also attach. These conditions are "reasonably related to the sentencing factors set forth in [§ 3553(a)]." They "involve no greater deprivation of liberty tha[n] is reasonably necessary for the purposes set forth in [§ 3553(a)(2)]." PSR ¶ 125. Such sentencing options should not be taken lightly and need to factor into the Court's sentencing calculus. They do not undermine the law; but instead, are contemplated by it. They will minimize Mr. Gordon's risk of recidivism and maximize the public's safety. All the while, they will ensure that he continues post-offense rehabilitative successes.

### G. THE NEED TO AVOID UNWARRANTED SENTENCE DISPARITIES AMONG DEFENDANTS WITH SIMILAR RECORDS WHO HAVE BEEN FOUND GUILTY OF SIMILAR CONDUCT.

The District Court is directed to consider the need to avoid unwarranted sentencing disparities among defendant with similar records who have been found guilty of similar conduct. 18 U.S.C. § 3553(a)(6). As the Government notes in its Sentencing Memorandum, avoidance of unwarranted sentencing disparities is "only one of several factors that must be weighed and balanced" by the sentencing court. ECF No. 34 at page 18, *citing United States v. Coppola*, 671 F.3d 220, 254 (2d Cir.2012). Additionally, and again as noted by the Government, the qualifier "unwarranted" "leaves plenty of room for differences in sentences when warranted under the circumstances." *Id., citing United States v. Brown,* 732 F.3d 781, 788 (7th Cir. 2013). In the case of the January 6th riot, involving hundreds of defendants, all of whom have different records, different backgrounds, and different roles in the offense, it is nearly impossible for a district court to impose similar sentences across a swath of defendants. In its Sentencing Memorandum, the Government has provided three example cases for comparison to Mr. Gordon's case: *United States v. Matthew Capsel*, 22-cr-107 (TSC); *United States v. Roger Baugh*, 22-cr-313 (JEB); and *United States v. Nolan Cooke*, 22-cr-52 (RCL). ECF No. 34 at pages 19-21. However, even the

Government concedes that "many salient differences explain the differing recommendations and sentences" and that "no previously sentenced case contains the same balance of aggravating and mitigating factors as present [in the Gordon case]. *Id.* at page 19. For example, unlike Mr. Gordon, Matthew Capsel joined a group of rioters who physically pushed against a police line and National Guard troops. Mr. Capsel was at the head of the mob and encouraged others to join, unlike Mr. Gordon. Mr. Capsel also bragged about his behavior on social media and appeared to wish death on senior members of Congress. Despite these differences, the Government is asking for the same sentence that Judge Chutkan ultimately imposed on Mr. Capsel. Roger Baugh, unlike Mr. Gordon, was part of a large mob that, according to the Government, engaged in several heave-ho pushes directly against a police line in the Lower West Terrace Tunnel of the Capitol building. Nolan Cooke, unlike Mr. Gordon, was on the front line of a group of rioter who broke through a police barricade. Again, unlike Mr. Gordon, Mr. Cooke encouraged other rioters to push against the police line and "get" the officers. Mr. Cooke also bragged about his activities on social media. Each of these examples, like every other January 6th defendant, engaged in behavior to some degree or another different than Mr. Gordon's behavior. Each of their records are likewise different. The District Court is left to look at Mr. Gordon's own misconduct, his history, and his post-offense rehabilitative success in arriving at an appropriate sentence. To the extent that no other defendant, or few other defendants, charged with this offense has received a probationary sentence is of no import as long as the Court is satisfied that the sentence is not unwarranted. Given the nature and circumstances of this offense, Mr. Gordon's personal history and characteristics, and considering the purposes of sentencing, a five (5) year probationary sentencing in this case is warranted and appropriate.

### III. CONCLUSION

For all of the reasons set for above, Mr. Gordon requests that the District Court impose a sentence of five (5) years probation (including any special conditions such as home detention or electronic monitoring), restitution in the amount of $2,000, and a special assessment fee of $100.

Respectfully submitted,

**JOHN THOMAS GORDON,**
By Counsel,

By:  *s/ Nicholas J. Compton*
     Nicholas J. Compton
     Attorney for Defendant
     WV State Bar ID 11056
     Federal Public Defender Office
     Summit Bank Building
     651 Foxcroft Avenue, Suite 202
     Martinsburg, West Virginia 25401
     Tel. (304) 260-9421
     Fax. (304) 260-3716
     E-Mail. Nicholas_Compton@fd.org

14

## CERTIFICATION OF SERVICE

I hereby certify that on March 6, 2023, I electronically filed the forgoing, ***Sentencing Memorandum on Behalf of John Thomas Gordon***, with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Andrew J. Tessman, AUSA
Office of the United States Attorney
300 Virginia Street East
Charleston, WV 25301


By:     s/ *Nicholas J. Compton*
        Nicholas J. Compton
        Attorney for Defendant
        WV State Bar ID 11056
        Federal Public Defender Office
        Summit Bank Building
        651 Foxcroft Avenue, Suite 202
        Martinsburg, West Virginia 25401
        Tel. (304) 260-9421
        Fax. (304) 260-3716
        E-Mail. Nicholas_Compton@fd.org